CORNISH *v.* FRIEDMAN.

Opinion delivered March 21, 1910.

1. SALES OF CHATTELS—WARRANTIES.—Whether an assertion by a vendor at the time of making a sale is an affirmation of a positive fact or, on the other hand, only praise and commendation, opinion or judgment, is a question for the jury, where its meaning is ambiguous, and in such case the intention of the parties may be gathered from the surrounding circumstances. (Page 293.)

2. INSTRUCTIONS—CONFLICT.—It is error to give instructions which are in irreconcilable conflict. (Page 293.)

3. SALES OF CHATTELS—WARRANTY.—Any affirmation of a material fact, as a fact, intended by the vendor as and for a warranty and relied upon as such, will constitute a warranty, whether the vendor intended to warrant or not; but mere representations by way of commendation, or which merely express the vendor's opinion, belief, judgment or estimate, do not constitute a warranty. (Page 294.)

4. SAME—DEFENSE.—Where, in a suit by one of the vendors of corporate stock to recover upon a purchase money note, the defense was a partial failure of consideration growing out of a breach of a warranty made by plaintiff in such sale, it is immaterial that the note was payable to plaintiff alone, who was a creditor of the corporation; if the plaintiff had to make good his warranty to the defendants, he would be entitled to contribution from the other stockholders according to the number of shares sold by them. (Page 295.)

Appeal from Sebastian Circuit Court, Fort Smith District; *Daniel Hon,* Judge; reversed.

STATEMENT BY THE COURT.

This was an action upon a promissory note in the Sebastian Circuit Court, the plaintiff reciting that the defendants, Lewis Friedman and I. Isaacson, had executed to the plaintiff on the 2d day of November, 1907, a promissory note for two thousand dollars, due thirty days after date without grace, with interest from date at eight per cent. per annum until paid, reciting the nonpayment of the same, protest fees $4.90, and concluding with

a prayer for the recovery of said two thousand dollars and interest and $4.99 protest fees.

Answering, defendants Friedman and Isaacson acknowledged the execution of said note, and that they had failed to pay, and set up in the second paragraph as a defense that the said Cornish, together with J. W. Crabtree, J. M. Crabtree, F. F. LaGrave, Isaac Kempner and Dave Kempner, were the owners of all the stock of the Merchants' Transfer Company, a corporation in the city of Fort Smith, and that the Crabtrees, LaGrave and Cornish were officers and directors. That the stock of said corporation amounted to five hundred shares of $25 each, owned as follows: J. W. Crabtree 120 shares, J. M. Crabtree 120 shares, LaGrave 120 shares, Cornish 70 shares, and the two Kempners 35 shares each. That on the day of the execution of the note Lewis Friedman bought all of said stock from said parties; that Cornish was the agent of the Kempners in said sale; that the Crabtrees, LaGrave and Cornish represented to and assured plaintiff that the bills and accounts payable of said corporation amounted to $2,485, itemized as follows: Overdraft $360, note $750, purchase price of horse $175, and accounts $1,200. That the said representations and assurances constituted a warranty. That, instead of owing $1,200, they owed $2,455, or $1,245 more than was represented. That at the same time said parties represented to and assured said defendant that the accounts due said corporation amounted to $3,100, when, as a matter of fact, they amounted to only $2,748.46, or $351.54 less than represented. That these representations and assurances on the part of the parties constituted a warranty. That the said Lewis Friedman had no knowledge of the assets and liabilities, and relied solely on the said representations and assurances, and that, relying upon such, he bought the stock and executed the note in suit for two thousand dollars to said Cornish, the same being part of the purchase price of said stock. That the co-defendant, Isaacson, signed said note as surety for said Lewis Friedman. That he did not learn of the discrepancy in the bills payable and bills receivable as set out above until he had paid $1,100 of said indebtedness and had executed the note to Cornish, and that by the said acts he had been damaged in the sum of $1,596.94, and a failure of consideration to that extent. That he would not have purchased the stock or executed the note but for said representations, and prays that the

same be taken as a cross-complaint against said ·Crabtrees, La-Grave and Cornish, and that the defendants be allowed credit on the note for $1,594 as ·of the date ·of its execution.

The Crabtrees and LaGrave filed answers to the cross-complaint, denying its allegations; but, as they passed out by the instructions and verdict, and are not parties here, it is unnecessary to set out their answer.

Appellee Friedman had arranged to purchase the capital stock of the Merchants' Transfer Company, a corporation doing : business at Fort Smith, Arkansas.

There were two gentlemen by the name of Crabtree, two by the name of Kempner, and one named LaGrave, and appellant who owned the stock of the company consisting ·of five hundred shares. The Crabtrees and LaGrave lived in Fort Smith, and they owned three hundred. and sixty shares of the stock. Appellant and the Kempners lived in Little Rock, and they owned one hundred and forty shares. The Crabtrees and LaGrave were the officers of the corporation, and constituted a majority also of its board of directors. The latter as individuals had agreed. with Friedman that they would sell him the entire capital stock of five hundred shares for the sum of fifty-four hundred dollars. The Crabtrees and LaGrave, in this tentative agreement with Friedman, undertook to secure the stock of the Kempners and appellant.

It was stipulated in this written agreement, which the Crabtrees and LaGrave had already signed, that the purchase price of fifty-four hundred dollars should be applied by Friedman as follows, towit: The sum of thirty-four hundred dollars to the payment of a note of the said Merchants' Transfer Company for said sum to the Fort Smith Bank & Trust Company, and the sum of two thousand dollars to the payment of a note of the said Merchants' Transfer Company for the said sum to Cornish and Kempner.

The ·Crabtrees and LaGrave also agreed that they would pay all of the indebtedness of the corporation, other than the two notes above mentioned, and there was a stipulation that "for the purpose of paying said indebtedness there shall be used the proceeds of collections of all accounts due said Merchants Transfer Company made prior to this date. If the proceeds of such collec-

tions are not sufficient to pay such indebtedness, the parties of the first part (Crabtrees and LaGrave) agree to pay whatever balance may be necessary to pay said indebtedness. If the proceeds of such collections are more than sufficient to pay such indebtedness, the surplus shall go to said parties of the first part."

This was the status of the negotiations when appellant appeared upon the scene at Fort Smith. The parties, it seems, were waiting for him. He would not agree to the arrangement that Friedman and the Crabtrees and LaGrave had made, and so it was never signed by Friedman, and was not carried out. From the time that Cornish appeared appellees contend that the further negotiations leading to the consummation of the purchase by them of the Transfer Company were conducted on the part of the company mainly by Cornish, and that he made certain representations as to the assets and liabilities of the Transfer Company which induced the appellees to consummate the purchase, and which amounted in law to personal and individual warranties on the part of appellant.

The appellee, Friedman, concerning this, testified in part as follows: "He (appellant) showed me that the company owed twelve hundred dollars, and were three hundred and sixty dollars overdrawn in the bank and a note for $750, on which Mr. Cornish was indorser; that was all they owed, $2,310. He showed me $3,100 owing them, and said: 'You can take off ten per cent. —three hundred and ten dollars—and that leaves twenty-six hundred and ninety, or three hundred and eighty dollars to the good.' I looked over the accounts, and asked him if they were good, and he said he couldn't tell. He said they were amounts people owed, and were accurate. I looked over the names, knew they were all right, and told him I would take the accounts, provided the people owed them. Mr. Isaacson was with us, but, to satisfy myself about the accounts, I asked him, 'Are you sure the people owe these?' speaking of one of the large accounts, and he answered, 'They are absolutely correct accounts.' And I asked again, I says, 'And twelve hundred dollars is all the company owes?' And he said, 'Not exceeding twelve hundred dollars; their account will not exceed twelve hundred dollars,' and Mr. LaGrave said, 'I don't see how it can be twelve hundred dollars.' Mr. Isaacson asked him, 'Is there anything else the company is indebted for?' And Mr. Crabtree said, 'Yes, there is a mortgage on a horse for

one hundred and seventy-five dollars.' He asked me if I was willing to make the deal on that basis, and I said, 'Yes, I believe I will do it, if the amount is not over twelve hundred dollars, and three hundred and sixty and seven hundred.' With that we went up to the bank, and I gave my check for $750 and $360, and gave Mr. Cornish a note for two thousand dollars. That is the note in controversy. I took possession and began paying the debts, and soon found that the accounts ran over twelve hundred dollars. Before my note was due I saw that the accounts were running nearly double the amount—twenty-four hundred dollars—and several accounts had receipted bills for what they had paid. Found that the acounts they owed through the town was twelve hundred more than they had stated to me. This representation was made to me by Mr. Cornish straight out; myself and Mr. Isaacson were present. There were several accounts, amounting to $354, that the people didn't owe, and they had receipted bills for, that they had failed to get credit for, and some of them had been charged twice through mistake, which was proved between Mr. Crabtree and the people that owed that they really didn't owe it. So when this note came due, I refused to pay it. I claim credit for $351.54 that I found on their accounts as due which was not owing to the Merchants' Transfer Company. The other is the twelve hundred dollars indebtedness that they owed more than they told me, making $1,551.54. I claim credit for that on the two thousand dollar note. The indebtedness of the transfer company before I bought the stock was fifty-four hundred dollars, two thousand to Mr. Cornish the Merchants' Transfer Company owed; that is, he was the indorser for the note given to the trust company. Thirty-four hundred dollars was the stock put up as collateral in the bank, the Fort Smith Bank & Trust Company, making fifty-four hundred dollars. They owed, in addition, about twenty-four hundred dollars city accounts and outstanding accounts; three hundred and sixty dollars overdraft; seven hundred and fifty dollar note, and one hundred and seventy-five dollars for a horse, making nine thousand eight-five dollars.

"We figured their equipment, horses and wagons, harness, feed and other things used by the transfer company at fifty-four hundred dollars, and the accounts due them at thirty-one hundred dollars. This was all the assets.

"They represented it to be eighty-five hundred dollars, and represented that they owed an indebtedness of twelve hundred dollars less than it really was. Mr. Cornish figured out on a piece of paper the thirty-one hundred dollars; there was no question about this. It was the only question discussed whether twelve hundred dollars would pay the total liabilities. I asked Mr. Cornish whether he was absolutely sure that twelve hundred dollars was all the indebtedness, and he told me it was. This was said in the presence of Mr. LaGrave and Isaacson, and La-Grave said at that time, 'I don't see how it could possibly go to twelve hundred dollars, and I am positive it wouldn't exceed twelve hundred dollars.' Mr. LaGrave and Mr. Cornish both said that in the presence of Mr. Isaacson and Mr. Crabtree."

The stock was transferred to the witness. He paid the three hundred and sixty dollar overdraft and the seven hundred dollar note, and gave Cornish a note for two thousand dollars.

The appellant, on the other hand, contends that the representations he made were not warranties, and not intended to be, and were not acted on by appellees as warranties. He further contends that the note in suit given to him by appellees for part of the purchase money represented the amount that the corporation owed him, and that he accepted the note in payment of same; that, if there was a partial failure of consideration for the sale of the stock of the Transfer Company, the entire amount thereof should not be deducted from the note held by him, but that it should be deducted from the entire consideration, and that he should be made to bear only his proportionate part of such failure.

To sustain his contention, he testified in part as follows: He lives in Little Rock, and has lived there for nearly twenty years; had some stock in the transfer company at Fort Smith, and represents the two Kempners. The officers of the company were LaGrave and Crabtree. Crabtree was the president, and LaGrave was the secretary and treasurer. They lived in Fort Smith. Had nothing to do with the details of the manage-ment. That Crabtree called him up on November 1, 1907, about the trade. Didn't know who it was with. "I don't remember seeing the contract; I might have seen it." Told

him in regard to that contract that I wanted to see the books first. "The company owed me two thousand ($2,000) dollars. I was also indorser on a note for seven hundred and fifty ($750) dollars, and I wanted to see that these things were taken care of. I told him I wanted to see the books, and I immediately commenced looking in the books for this statement—the statement you have there. This showed the assets of the company to be about thirty-one hundred ($3,100) dollars and the indebtedness seven hundred and fifty ($750) dollars to the Fort Smith Bank, three hundred and sixty ($360) dollars overdraft and two thousand ($2,000) dollars they owed the Kempners and myself. Twelve hundred ($1,200) dollars was estimated to cover the city bills. I told them that the. statement was what was shown by the books, but I could not certify as to the correctness of the accounts. That I did not know how much the outstanding bills were, but that we could go back and get them from . Crabtree and LaGrave, the people in charge, and we did so. I told him I did not know what they were, and we would have to get them from Crabtree and LaGrave. I am not positive whether the question about outstanding accounts came up before or after we went down to the office. When we went to the transfer company's office, Mr. Friedman and Mr. Isaacson went over every account of any consequence on this list with Mr. Crabtree, and also asked them about the outstanding city bills. They asked Mr. LaGrave, and he said, as near as he could estimate, it was twelve hundred ($1,200) dollars. I do not remember whether Mr. Crabtree made a statement or not. I told Mr. Friedman all along that I did not know what the outstanding city bills were; that the books did not show, and I had no way of knowing, and we could only get the information from Crabtree and LaGrave. I positively did not at any time state to Mr. Friedman that I would guaranty the correctness of the outstanding accounts. Mr. Friedman did not so testify at the last term of the court. I had no knowledge or information of any kind as to the amount of outstanding city bills until I had asked Mr. LaGrave about it. I am not. positive that I asked him. The question was asked when we were down there. I said I thought Friedman asked him. However, one of us asked him, and we got the information from LaGrave, and that is the only source

from which I could get it. I did not get the bills, and there was nothing on the books to show."

LaGrave testified on behalf of appellant, in part, as follows:

"When Mr. Cornish, Isaacson and Friedman were in the office and asked about the amount of the outstanding city bills —in other words, what we owed for supplies and city accounts —I told them I could not answer; that it was the first of the month, and a lot of bills would not be in until the tenth of the month. They were in the habit of bringing them around from the first to the fifteenth, and besides bills I did not know of; that I could not give them a positive statement as to the amount of the outstanding accounts. They insisted, and I told them that the only thing I could give them was an estimate of the approximate amount; then they wanted to know what the approximate amount would be, to the best of my knowledge, and after studyng the things a little I named twelve hundred ($1,200) dollars; stated that it was approximately twelve hundred ($1,-200) dollars. I most positively did not state in that connection that the outstanding debts would not exceed twelve hundred ($1,200) dollars."

The court instructed the jury at the instance of appellant as follows:

"1. The court instructs the jury that, in order to constitute a warranty, there must be a positive affirmation of fact, not made as a matter of belief or opinion, for the purpose of assuring the buyer of the truth of the fact and inducing him to make the purchase, and which is so received and relied upon by the purchaser.

"2. The court further instructs you that, before you can find that the said Ed Cornish made any warranty to the effect that the oustanding city bills referred to in the evidence owing by said transfer company amounted to only twelve hundred dollars, you must find that he stated as a fact that said outstanding city bills would amount only to that sum, and that such statement was made for the purpose of assuring said Friedman of that fact and inducing him to make the purchase of the stock, and that said Friedman received and relied upon said statement so made by said Cornish.

"3. If you find from the evidence that said Cornish did not

know what the said outstanding city bills would amount to, and that he so stated to Friedman, and that they inquired of La-Grave the amount of the same, and LaGrave stated that they would amount to $1,200, and said Friedman and said Cornish relied upon said statement of LaGrave in making said deal, then there was no warranty upon the part of said Cornish as to the amount of said outstanding city bills.

"4. Before you can find against the said Ed Cornish on account of a shortage of the accounts owing to said Merchants' Transfer Company, you must find either that said Cornish agreed in express terms to guaranty the amount thereof, or that he stated positively that they amounted to the sum of $3,100; and if you find that said Cornish took the list of accounts from the books of the company, and this fact was known to said Fried-man, and said Cornish stated to said Friedman in substance that he had no other information in regard to them than as shown by the books of the company, this would not constitute a warranty as to the correctness of said accounts.

"5. If you find from the evidence that the only informa-tion Cornish had as to the bills payable of the transfer company was obtained from LaGrave in the presence of Friedman, and that was to the effect that said LaGrave could only estimate them at $1,200, then there was no warranty on the part of Cornish as to the amount of said indebtedness."

At the instance of appellees, and over the objection of ap-pellant, the court gave the following prayers (after first stat-ing the alleged representations of appellant) towit:

"1. There are two questions for the jury to determine. (1) Whether said Ed Cornish made to plaintiff such repre-sentations or assurances, and (2), if so, whether such repre-sentations amounted to a warranty that they were true. A warranty is an expressed or implied statement of something which a party undertakes shall be a part of the contract. It is not necessary that in making the contract the word 'warranty' be used. No particular phraseology is required to constitute a warranty. If the person makes a positive affirmation as to any fact affecting the value of the property sought to be sold, or utters what is equivalent to a promise regarding it, instead of expressing a belief merely, then such affirmation or promise ·

amounts to a warranty, and he is liable upon it if the other party relied upon it. It does not depend upon whether the person who made the affirmation intended to be bound by it or not; nor does it depend upon whether he knew it to be true or not. If he makes it whether in good faith or not, and the purchaser relies upon it in making the purchase, then it constitutes a warranty and the person making it is bound by it.

"2. If you find from the testimony that Ed Cornish represented to Friedman that the accounts owing by the Merchants' Transfer Company amounted to twelve hundred dollars, when in fact they amounted to twenty-four hundred forty-five dollars, or any other sum in excess of twelve hundred dollars, and you further find that Ed Cornish represented to Friedman that the bills collectable of the Merchants' Transfer Company amounted to thirty-one hundred dollars, when in fact they amounted to twenty-seven hundred forty-eight and 46-100 dollars, or any other sum less than thirty-one hundred dollars, and Friedman in making the purchase of the stock of the Merchants' Transfer Company relied upon such representations, then you are instructed to allow credit on the note sued on for the difference between such amounts as represented and the amounts as they really were.

"3. If Cornish made inquiry of LaGrave as to the amount of city bills the Merchants' Transfer Company owed, and La-Grave replied that they were about twelve hundred dollars, or would not exceed twelve hundred dollars, and Cornish accepted and adopted that amount in his negotiations with Friedman with the intention of having Friedman rely on that amount in making his calculations, and that Friedman did rely on that amount in making the trade, then you are instructed that Cornish was bound by that statement as to the amount of city bills, and Friedman and Isaacson will be entitled to a credit on said note for said sum as of the date of the note."

Appellant duly excepted to the ruling of the court. The jury returned a verdict in favor of appellees in the sum of $504.83. From a judgment entered in favor of appellees for that sum this appeal has been duly prosecuted.

*Read & McDonough* and *Mehaffy, Williams. Cockrill & Armistead,* for appellant.

1. In order to constitute a warranty, there must be a po ˑi- tive affirmation of fact, and not a mere expression of belief. or opinion, made for the purpose of assuring the buyer of the truth of the fact and to induce him to make the purchase. If such statements are not made with the intention of influencing the buyer and accepted by him, there is no warranty. 74 Ark. 568; 54 Am. Dec. 741; 4 Har. (Del.) 425; 1 Houst. (Del.) 215; 15 Ill. 345; 64 Mo. 531; 24 N. C. 411; 48 N. C. 419; 66 N. C. 596; 18 Vt. 176; 35 Vt. 577; 11 Ill. 35; 120 Ill. 199.

2. The error in an inherently incorrect instruction is not cured by giving other instructions correctly declaring the law on the subject. 77 Ark. 200; *Id.* 64; 65 Ark. 64; 76 Ark. 224; *Id.* 69; 74 Ark. 585.

3. If there was a discrepancy in the amount of indebted- ness which appellees assumed, whether it be warranties or not, such discrepancy went to the diminution of the consideration of the entire purchase price. Cornish could not be made to bear the whole burden. Failure of consideration pleaded as a defense to a promissory note must be entirely between the parties. 4 Cyc. (2 ed.) 196.

*Youmans & Youmans,* for appellees.

Any distinct assertion or affirmation of the quality or char- acter of the thing to be sold, made by the seller during the ne- gotiations for the sale, which it may reasonably be supposed was intended to induce the purchase and was relied upon by the purchaser, will be regarded as a warranty, unless accompanied by an express statement that it is not intended as such. 30 Am. & Eng. Enc. of L. 137; Tiedeman on Sales, 282-3; 11 Ark. 340. "It is not necessary that the vendor should have intended the representation to have constituted a warranty." 118 N. Y. 260; 81 S. W. 262; 87 Ky. 161; 51 N. Y. 202; 67 Tenn. 162.

WOOD, J., (after stating the facts). 1. In the "American note" to "Benjamin on Sales," concerning the subject of "what constitutes an express warranty," it is said:

"(1). All agree that neither the word 'warrant' nor any other particular word or form of words is necessary.

"(2). All agree that mere words of praise and commenda- tion, or which merely express the vendor's opinion, belief, judg- ment, or estimate, do not constitute a warranty.

"(3). All agree that any positive affirmation of a material fact as a fact, *intended by the vendor as and for a warranty,* and relied upon as such, is sufficient; and some hold the actual intent to warrant unnecessary.

"(4). All agree that whether a particular assertion is an affirmance of a positive fact, or, on the other hand, only praise and commendation, opinion or judgment, is a question for the jury, where the meaning is ambiguous, and the intention of the parties may be gathered from the surrounding circumstances." Benj. on Sales, p. 664.

According to the last of the above subdivisions, it is clear that whether the alleged representations of appellant in this case were warranties or not was, under the evidence, a question for the jury. The court properly submitted that question in prayers granted at the instance of appellant. But the court in prayer number 2 granted at the request of appellees allows the jury to find appellant liable to appellees if they find that appellant made certain representations that were not in fact true, and if they further find that appellee, Friedman, relied upon such representations in making the purchase of the stock of the transfer company. This instruction would make Cornish liable, even if he made such representations only as matter of opinion, belief, judgment or estimate, which, if so made, according to all the authorities, would not be a warranty. The law in this regard is correctly expressed in prayer number 1 asked by appellees and given by the court, also in prayer number 1 given at the request of appellant. But the omission of this idea from prayer number 2 *supra* given at the request of appellees makes the instruction inherently defective and incomplete and an unsound proposition of law, which must be so held on a general objection thereto. It is wholly irreconcilable with the correct prayers. *Bayles* v. *Daugherty,* 77 Ark. 200; *St. Louis, I. M. & S. Ry. Co.* v. *Beecher,* 65 Ark. 64; *Id.* v. *Hitt,* 76 Ark. 224; *Grayson-McLeod Lumber Co.* v. *Carter,* 76 Ark. 69; *Jones* v. *State,* 89 Ark. 213; *Miller* v. *Nuckolls,* 77 Ark. 64; *Fletcher* v. *Eagle,* 74 Ark. 585; *St. Louis, I. M. & S. Ry. Co.* v. *Rodgers,* 93 Ark. 564.

The above instruction and also instruction number 1 given at the instance of appellees also ignored the question as to

whether, in order to constitute a warranty, it is necessary that the vendor intend that his representations shall be a warranty.

In *Sauerman* v. *Simmons,* 74 Ark. 568, we said: "The law is well settled that any affirmation of a material fact, as a fact, intended by the vendor as and for a warranty, and relied upon as such is sufficient; but mere representations by way of commendation, or which merely express the vendor's opinion, belief, judgment or estimate, do not constitute a warranty." The only question in that case was whether or not the court erred in giving an instruction which assumed that a certain representation was a warranty, instead of submitting the question to the jury. Therefore our announcement of what constituted a warranty in that case was *obiter dictum.* The announcement, however, was strictly correct, as shown by all the authorities according to the American note (2) and (3) quoted above from Benjamin on Sales. It will be observed that we only announced in *Sauerman* v. *Simmons, supra,* that representations of a "material fact, as a fact, *intended by the vendor as and for a warranty,*" etc., is sufficient. Of course, in such case, where the representation is "intended by the vendor as and for a warranty," there can be no question about it. But we did not by the above language say or hold that an intention to warrant was a necessary element, or conversely that the actual intent to warrant was unnecessary. That question is presented here in the giving of appellee's prayer number 2 and in ignoring the proposition in appellee's prayer number 2.

Is an intention to warrant on the part of the vendor necessary to constitute a warranty? The text in 30 Am. & Eng. Ency. of Law (2 ed.), is as follows: "It was laid down in a very early case that an affirmation made at the time of the sale in regard to the character or quality of the thing sold is a warranty, provided it appears that it was intended as such, and this is the prevailing view now. In determining whether the affirmation was intended as a warranty the decisive test is whether the seller assumed to assert a fact of which the buyer was ignorant, or merely expressed an opinion or judgment upon a matter about which the seller had no special knowledge, and as to which the buyer might be expected to exercise his own judgment or be equally able to form a correct opinion. In the

former case there is a warranty, in the latter there is not." As sustaining the text, cases are cited from various States in the footnote 4. But see to the contrary 30 A. & E. Ency. Law, 140.

The author of the "American note" to Benjamin on Sales, at page 665, has this to say: "The better class of cases holds that a positive affirmation of a material fact, as a fact, intended to be relied on as such, and which is so relied upon, constitutes in law a warranty, whether the vendor mentally intended to warrant or not; and that his intention is immaterial." Citing cases.

Mr. Tiedeman, in his work on Sales, at page 283 ´says: "Some of the cases hold that, in order that any statement of the seller may amount to an express warranty of quality, it must be shown that he made the statement with the intention of warranting its truth. Unless this intention appears, it matters not how material and precise the statement is, it will not amount to a warranty. But the better opinion is that any positive statement of a material fact, which is made with the intention of influencing the buyer to buy, and the truth of which is relied upon by the buyer, will constitute a warranty, whether the seller intended to warrant the goods or not. The intention to warrant is conclusively presumed from his effort to influence the buyer's actions by a statement of fact." See cases cited in note to sustain the text.

We concur with Mr. Tiedeman and the author of "American note" to Benjamin on Sales in the views above expressed. See also *Buckman* v. *Haney*, 11 Ark. 340; 30 A. & E. Ency. (2 ed.) 140 *supra*.

2. The evidence shows that appellees purchased the entire capital stock of the corporation. The note executed to Cornish was not in payment for his shares of stock or of his shares and Kempners, but was in part payment for all the shares of stock purchased. The warranty, if there was a warranty, applied as well to that note as to any other note, or any other part of the consideration. The defense of partial failure of consideration, growing out of the alleged breach of warranty, would be good against any one who sought to recover from the appellees the entire consideration or any part thereof. Contribution was a matter between Cornish and the other stockholders. If there

was a partial failure of consideration which Cornish had to make good to the purchaser of the stock, he could call upon the other stockholders to pay their proportion according to the number of shares owned by each of them. But he could not hold appellees for that proportion. They were not liable for it. Moreover, there is no reversible error in the instructions on this point, because the question was not specifically raised in any manner in the trial court, and can not be raised here for the first time.

For the error indicated in giving appellee's prayer for instruction number 2, the judgment is reversed, and the cause is remanded for new trial.